CHARLES COUGHLIN, JR. and
STAVROULA BOURIS,
    Plaintiffs,

    v.                                  CIVIL ACTION NO.
                                          10-10203-MLW

TOWN OF ARLINGTON,
ARLINGTON SCHOOL COMMITTEE,
NATHAN LEVENSON, TRACY BUCK,
and JEFFREY THIELMAN,
    Defendants.

**REPORT AND RECOMMENDATION RE:
DEFENDANTS ARLINGTON SCHOOL COMMITTEE'S,
NATHAN LEVENSON'S, TRACY BUCK'S, AND
JEFFREY THIELMAN'S
MOTIONS TO DISMISS
(DOCKET ENTRY ## 20, 22, 30, & 38)**

**January 31, 2010**

**BOWLER, U.S.M.J.**

    Defendants Arlington School Committee (the "School Committee"), Nathan Levenson ("Levenson"), Tracy Buck ("Buck") and Jeffrey Thielman ("Thielman") (collectively: "defendants") move to dismiss all counts of the complaint. (Docket Entry ## 20, 22, 30 & 38). Plaintiffs Charles Coughlin ("Coughlin") and Stavroula Bouris ("Bouris") (collectively: "plaintiffs") filed timely opposition motions. (Docket Entry ## 32, 34,36 & 42). After conducting a hearing on September 29th, 2010, this court took the motions under advisement.

In 2007 plaintiffs filed a three count complaint in the Massachusetts Superior Court in Middlesex County (the "prior action").[1]  The complaint identified the Arlington Public Schools[2] and two unknown Does as defendants.  Coughlin, in counts I and II respectively, sought relief from the two Doe defendants for intentional interference with contractual relations and interference with advantageous relations.  In Count III, both plaintiffs sought to enjoin the Arlington Public Schools from disclosing certain emails to the local media[3] that plaintiffs argued were private and not subject to public disclosure.

On motion, the court denied the injunction and ruled that the emails were public records and therefore subject to disclosure and publication.  Shortly thereafter, the plaintiffs and the Arlington Public Schools entered into a voluntary

---

[1]  Charles E. Coughlin Jr v. Arlington Public Schools, Unpublished Civil Matter # 07-3100 (Docket Entry # 21, Ex. 1).

[2]  During the hearing on these pending motions, defendants argued that no such entity exists and that during the prior action the School Committee acted as defendant.  The School Committee suggests that it defended the action as if it were the named defendant because it was and is the governing body of what could colloquially be called the Arlington Public Schools. Plaintiff acknowledged during the hearing that the Arlington Public Schools was a fiction created for the expedience of litigation.

[3]  The emails were requested by local media pursuant to Massachusetts General Law chapter 66 section 10 and the Freedom of Information Act, 5 U.S.C. § 552.  (Docket Entry # 21, Ex. 2).

stipulation of dismissal with prejudice pursuant to Rule 41(a)(1)(ii). Mass. R. Civ. P. 41(a)(1)(ii). The Doe defendants were never identified or served and were not signatories to the stipulation of dismissal.

In separate but factually related litigation, Arlington Public Schools appealed an arbitration award in favor of Coughlin to the Superior Court of Massachusetts in Middlesex County (the "Middlesex Superior Court").[4] The Middlesex Superior Court, in ruling on cross motions for a judgment on the pleadings, found that the arbitrator went beyond the scope of the question presented to him and therefore vacated the arbitrator's decision and remanded the matter for a new arbitration in line with the order. (Docket Entry # 31, Ex. 2)

On February 8th, 2010, plaintiffs filed a 40 count complaint with this court (Docket Entry # 1) alleging a variety of claims against the five defendants.[5] Plaintiffs assert civil rights claims against all four defendants pursuant to section 1983.

---

[4] Arlington Public Schools v. Charles E. Couhglin Jr., Unpublished Civil Matter # 09-4430. (Docket Entry # 31, Ex. 2). The pleadings for that matter have not been provided to this court. The order on the dispositive motions in that case, however, has been provided. (Docket Entry # 31, Ex. 2).

[5] In addition to the four defendants that filed the motions to dismiss now being considered, plaintiffs are also suing the Town of Arlington for negligent supervision of its employees pursuant to Massachusetts General Law chapter 258 and for civil rights violations pursuant to 42 U.S.C. § 1983 ("section 1983"). At this point, the Town of Arlington has not submitted a dispositive motion.

Additionally, Bouris brings a claim against Levenson, and Coughlin against Thielman, pursuant to Massachusetts General Law chapter 12, section 11I ("section 11I") asserting violations of their constitutional rights through threats, intimidation or coercion. Further, plaintiffs seek relief from all of the individual defendants for invasion of privacy pursuant to Massachusetts General Law chapter 214, section 1B ("section 1B"), as well as for the common law torts of defamation, intentional infliction of emotional distress ("IIED") and interference with an advantageous business relationship ("IABR").

STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010).

In considering the merits of a motion to dismiss, the court is limited in its review to the "facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and matters of which judicial notice can be

4

taken." Nollet v. Justices of the Trial Court of Mass., 83
F.Supp.2d 204, 208 (D.Mass. 2000).  Furthermore, the court must
accept all factual allegations in the complaint as true and draw
all reasonable inferences in favor of the plaintiff.  See
Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir.
2000).  If the facts in the complaint are sufficient to state a
cause of action, a motion to dismiss the complaint must be
denied.  See Nollet, 83 F.Supp.2d at 208.

Although this court must accept as true all of the factual
allegations contained in the complaint, it is not appropriate to
consider legal conclusions.  See Ashcroft v. Iqbal, _ U.S. _ ,
129 S.Ct. 1937, 1949 (2009) ("[t]hreadbare recitals of the legal
elements, supported by mere conclusory statements, do not suffice
to state a cause of action"); accord Maldonado v. Fontanes, 568
F.3d 263, 268 (1st Cir. 2009).  Accordingly, a complaint does not
state a claim for relief where the facts presented fail to
justify anything more than an inference of the mere possibility
of misconduct.  Iqbal, 129 S.Ct. at 1950 (requiring well plead
facts making the cause of action plausible as opposed to merely
possible).


FACTUAL BACKGROUND[6]

---

[6] Unless otherwise indicated all factual allegations are
taken from the complaint.  (Docket Entry #1).  Citation to the
record is made only for direct quotes.

Bouris was hired as the Assistant Principal at Ottoson Middle School ("Ottoson") in the Arlington School District in 1998.  In 1999, Coughlin was hired as a technology teacher at Ottoson.  Coughlin's employment was subject to a contract pursuant to a collective bargaining agreement between the School Committee and the Arlington Education Association.  It was at this time that the two, Bouris and Coughlin, met and became friends and began exchanging emails on a daily basis.  In 2002, Coughlin was promoted to the Lead Teacher position of the Technology Education Department.  That same year Bouris was promoted to the position of Principal at Ottoson.

In July 2005, Levenson was hired by the School Committee as Superintendent of the Arlington Public Schools.  It is the School Committee's responsibility to hire and fire the Superintendent as well as promulgate policy for the school system.  The Superintendent is responsible for running the day to day operations of the Arlington Public Schools.

Shortly after being hired, Levenson, "absent any legitimate cause . . . embarked on a course of action designed to oust Bouris from her position as principal[.]"  (Docket Entry # 1). For example, Levenson appointed a "mentor" for Bouris.  (Docket Entry # 1).  Plaintiffs suggest that no other "experienced principal" was assigned a mentor and that in practice this mentor

was a "spy."[7]  (Docket Entry # 1).  In a June 2006 evaluation, Levenson praised Bouris' performance but also set "amorphous goals . . . seemingly at odds with the praise."  (Docket Entry # 1).  A few months later Levenson issued a "memo of concern" that criticized Bouris' abilities.  (Docket Entry # 1).  Plaintiffs maintain that this was done to create a "false impression that her job was deficient [sic]."  (Docket Entry # 1).

In January 2007, Levenson informed Bouris that he had not reached a decision regarding the renewal of her contract.  The following month, Levenson allegedly put pressure on Bouris to resign by suggesting that a story involving the fondling of a child could be disastrous for Bouris' career.[8]  Bouris did not resign.

On March 7th, 2007, Levenson publically announced that he would not be renewing Bouris' contract.  In response other members of the Ottoson staff as well as students and their parents appeared at a School Committee meeting.  During the meeting the School Committee was informed that the staff of Ottoson had voted 100% in confidence of Bouris, and 100% no

---

[7]  Plaintiffs do not elaborate on what is meant by "mentor" or in what way the mentor actually functioned as a "spy."

[8]  This court assumes that the implication here is that such a story would be generated and propagated by Levenson if Bouris did not resign.  There are no allegations that Levenson, or anyone else, ever carried out this threat by starting such a rumor.

confidence in Levenson.  Additionally, at least one teacher and one School Committee member publically attacked the credentials, character and intentions of Levenson and generally criticized his policies and management style.  In a subsequent School Committee meeting Coughlin "reported that Levenson had never been appointed as Assistant Superintendent of the Harvard Public Schools as he had claimed on his resume."  (Docket Entry # 1).  As a result of these events, Levenson retracted his earlier decision and renewed Bouris' contract.

Allegedly, Levenson and others then set out on a course of conduct designed to retaliate against plaintiffs and to "ensure the process of renewing Bouris' contract would be publically humiliating to Bouris."  (Docket Entry # 1).  In April 2007, Thielman, a member of the School Committee, told Coughlin that "if he continued to challenge the Superintendent and/or School Committee he would lose his job."  (Docket Entry # 1).  Shortly thereafter, Levenson tried to have Coughlin's job eliminated through budget cuts, and also tried to remove Coughlin from his Lead Teacher position.[9]  Both attempts were unsuccessful.

Around the same time, Levenson, "with or without the help of

---

[9]  Levenson attempted this by eliminating the 0.4 administrative time that came with this title.  Losing that time allocation would have required Coughlin to make it up by teaching additional classes.  There were no additional classes available so Coughlin filed a grievance that resulted in a ruling that Levenson had violated the collective bargaining agreement and vacating the change.

others," allegedly began monitoring Bouris' work email account. In early June, 2007, Buck, the district's network technician, received an anonymous note that Bouris and Coughlin were having an "improper relationship."  (Docket Entry # 1).  According to Buck she destroyed the note immediately and was the only one to have seen it.

On June 6th, Levenson, "and perhaps Buck and others," printed emails from Bouris' work account.  (Docket Entry # 1). Therein they found the username and password for one of Bouris's non-work email accounts which Levenson then proceeded to access. Levenson claims that the private account was accessed in furtherance of an investigation into the proported "improper relationship" between Coughlin and Bouris.  Plaintiffs maintain that the investigation violated district policies that prohibited the investigation of anonymous complaints.

Next, Levenson received an anonymous package of email communications between Coughlin and Bouris, which included emails from Bouris' private account.  In response to the content of these emails, as well as those that had been previously accessed (collectively:  "the emails"), Levenson retained private counsel Alan Miller ("Miller") to conduct an investigation into the relationship between Coughlin and Bouris.

On June 10th, Levenson sent a memo to the School Committee informing them of his receipt of the emails and the retention of

Miller for the purposes of the investigation. On June 13th,
Levenson informed both Bouris and Coughlin of the same, and also
told them that he would recuse himself from the investigation due
to their past dealings.

During the course of his investigation, Miller attempted to
persuade Coughlin to resign by telling him that information from
the investigation could leak and that the publicity would be bad
for his career and family. Miller kept Levenson apprized of
things by submitting reports throughout the investigation. One
such report reduced the chain of events leading up to the
investigation to writing and discussed the content of some of the
emails between Coughlin and Bouris. A later report dated August
8th, 2007, explained Miller's concern regarding the accessing of
Bouris' non-work email account, but concluded that Buck had not
acted inappropriately.

Plaintiffs maintain that the investigation was a facade and
was manipulated by Levenson and Miller to provide the appearance
of legitimacy to the predetermined decision to fire plaintiffs.
It is suggested that Levenson kept a contemporaneous log of
events which "reveals his knowing contravention of policy,
practice, law, and criminal statute." (Docket Entry # 1). The
log apparently also accuses Buck of criminal activity and other
misconduct. Plaintiffs suggest that the illegitimacy of the
investigation is further supported by the allegation that

Levenson offered Bouris' job to other people prior to the conclusion of the investigation.

On about July 15, 2007, Thielman, alone or in conjunction with Levenson released the emails, along with statements that plaintiffs had forged documents, to the local media. On August 9, 2007, Levenson terminated Coughlin's employment citing the content of the emails as cause. On September 5, 2007, Bouris was similarly terminated.

DISCUSSION

I. <u>Res Judicata</u>

As an initial matter, res judicata is an affirmative defense and therefore is to be raised in the pleadings or else is waived. <u>See</u> <u>Boyd v. Jamaica Plain Co-op. Bank</u>, 386 N.E.2d 775, 778 n. 7 (Mass.App.Ct. 1979). Levenson and the School Committee filed no answer to the complaint and therefore did not properly plead the affirmative defense of res judicata. It is, however, within the courts discretion to allow a defense of res judicata to stand when raised for the first time, as is the case here, in a motion to dismiss when that dispositive motion is serving ipso facto as a defendant's responsive pleading. <u>Id.</u> Moreover, because plaintiffs failed to object to the procedure by which the issue of res judicata has been raised, this court will address the defense as if it were properly raised in the pleadings. <u>Id.</u>

The doctrine of res judicata may refer to one of two legal concepts: (1) "claim preclusion" whereby the claims that "were raised or could have been raised in [a prior] action" are precluded from rehearing in a subsequent action; or (2) "issue preclusion" (also known as collateral estoppel) whereby a party is bound by a factual or legal determination made in a prior action arising out of the same operative facts. <u>Taylor v. Sturgell</u>, ___ U.S. ___, 128 S.Ct. 2161, 2171 n. 5 (2008) (suggesting terms "issue preclusion" and "claim preclusion" be used to avoid "confusing lexicon" of res judicata); <u>see</u> <u>generally</u> <u>Maher v. GSI Lumonics, Inc.</u>, 433 F.3d 123, 126 (1st Cir. 2005). Levenson and the School Committee only raise the defense of claim preclusion in their papers. As is discussed in greater detail infra, issue preclusion will also be addressed for purposes of deciding these dispositive motions.

A. <u>Claim Preclusion</u>

"It is now well established that local law should be used in deciding the preclusive effect to be given a local judgment in a federal court." <u>Oliveras v. Miranda Lopo</u>, 800 F.2d 3, 6 (1st Cir. 1986). Therefore, Massachusetts law will be applied to decide the preclusive effect of the prior litigation on the case

at bar.[10]  Pursuant to Massachusetts law, for the prior action to
have preclusive effect on the current litigation "'three elements
are required . . .[:]  (1) identity or privity between the
parties to the present and prior action; (2) identity of the
causes of action; and (3) prior final judgment on the merits.'"
TLT Const. Corp v. A. Anthony Tappe and Associates Inc., 716
N.E.2d 1044, 1049 (Mass.App.Ct. 1999) (quoting Gloucester Marine
Rys. Corp. v. Charles Parisi, Inc., 631 N.E.2d 1021, 1024
(Mass.App.Ct. 1994)).  It should be noted that there is nothing
peculiar about civil rights claims that acts to alter the usual
application of claim preclusion principles.  Isaac v. Schwartz
706 F.2d 15, 16 (1st Cir. 1983) ("[r]es judicata applies in civil
rights actions").

### 1.  Identity or Privity of Parties

     In order for claim preclusion to be applied, the parties to
the present and prior actions must be identical or in privity.
TLT, 716 N.E.2d at 1049.  "There has to be a 'sufficient legal
identity' between the interest of the person allegedly
represented and the prior litigant for the later claim to be
precluded."  Mongeau v. Boutelle, 407 N.E.2d 352, 356
(Mass.App.Ct. 1980) (quoting Rudow v. Fogel, 382 N.E.2d 1046,
1048 (Mass. 1978)); see Boyd, 386 N.E.2d at 778 (holding that the

---

    [10]  Massachusetts law is controlling for purposes of this
court's analysis of both claim and issue preclusion.

current party was "sufficiently identified" with the parties to the prior litigation).

Accordingly, "'a nonparty to a prior adjudication can be bound by it only where the nonparty's interest was represented by a party to the prior litigation.'" TLT, 716 N.E.2d at 1050 (quoting Massachusetts Prop. Ins. Underwriting Ass'n v. Norrington, 481 N.E.2d 1364, 1366-1367 (Mass. 1985)). This requires more than a shared interest in the outcome, but a virtual representation of the one party by the other. Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 757-758 (1st Cir. 1994) (finding identity of interest necessary but insufficient to establish privity, privity only where the legal attributes of party status can be imputed); accord North Atlantic Distribution Inc. v. Teamsters Local Union No. 430, 497 F.supp.2d 315, 321 (D.R.I. 2007).

The prior action sought to enjoin Arlington Public Schools from releasing the emails to the press and brought substantive legal claims against two unnamed Doe defendants. Plaintiffs argue that because neither the School Committee nor Levenson were parties to the prior action the defense of claim preclusion is unavailable. Those defendants argue in rebuttal that they were in privity with the Arlington Public Schools, in the case of both Levenson and the School Committee, or as is additionally suggested by Levenson, with the Doe defendants. This court

14

refrains from addressing Levenson's claim of privity or identity with the Doe defendants because, as discussed infra, the issue of identity is mooted by the lack of a valid final judgment respecting the Doe defendants.

Additionally, Levenson's claim of privity with Arlington Public Schools is unpersuasive. In his brief Levenson relies on In re El San Juan Corp., 841 F2d 6, 10 (1st Cir. 1988), in suggesting that the doctrine of non-mutual claim preclusion applies in this case to bar plaintiffs' claims against him because of his close employment relationship with the Arlington Public Schools (as discussed infra, actually the School Committee). Levenson's reliance on San Juan is misplaced given that Massachusetts law is controlling.

Non-mutual claim preclusion is a federal doctrine and has been explicitly rejected by the Massachusetts courts. Hermes Automation Technology, Inc. v. Hyundai Electronics Industries Co., Ltd., 915 F.2d 739, 751 (1st Cir. 1990). Under Massachusetts law, an employee and employer are not sufficiently linked so as to be able to rely on the litigation of a claim by one to preclude future litigation of the same matter against the other. Cf. Mancuso v. Kinchla, 806 N.E.2d 427, 437 (Mass.App.Ct. 2004) (applying federal law to find privity between employer-employee). Thus, Levenson was not in privity with Arlington Public School and his motion to dismiss on claim preclusion

grounds is denied.

Conversely, the School Committee's suggestion that it was either in privity with the Arlington Public Schools or was for all practical purposes actually that entity is meritorious. During the hearing on these pending motions, defendants argued that the Arlington Public Schools is a nonexistent entity and that during the proceedings in the prior action the School Committee acted as defendant. During the same hearing, plaintiffs acknowledged that the Arlington Public Schools was a fiction created for the expedience of litigation. Specifically, the Arlington Public Schools was the named entity for purposes of furnishing notice of the prior action seeking an injunction.

While plaintiffs stopped short of conceding that the Arlington Public Schools and the School Committee are one and the same, it is clear from the record that they are. Following the admissions by plaintiffs at the hearing it is now uncontroverted that the Arlington Public Schools is a mere colloquialism used by plaintiffs for purpose of providing notice, and can reasonably be inferred in context to refer to whatever entity is the governing body of the Arlington public school system. Plaintiffs acknowledge in the complaint that "[at] all times relevant to this Complaint, the Arlington School system is governed by the School Committee [and] [t]he School Committee is responsible for promulgating policy for the Arlington Public Schools and for

hiring the Superintendent of Schools to administer the daily
operations." (Docket Entry # 1) (citing section 59 of
Massachusetts General Laws chapter 71). Therefore, it is clear
from the record that the School Committee and the Arlington
Public Schools, for purposes of claim preclusion, are at least in
privity if not the same entity.

### 2. Identity of the Causes of Action

"'A claim is the same for [claim preclusion] purposes if it
is derived from the same transaction or series of connected
transactions.'" TLT, 716 N.E.2d at 1051 (quoting Saint Louis v.
Baystate Med. Center, Inc., 568 N.E.2d 1181, 1185 (Mass.App.Ct.
1991)). "'The statement of a different form of liability is not
a different cause of action, provided it grows out of the same
transaction, act, agreement, and seeks redress for the same
wrong.'" TLT, 716 N.E.2d at 1051 (quoting Mackintosh v.
Chambers, 190 N.E. 38, 39 (Mass. 1934)). Therefore, the fact
that in the prior action plaintiffs sought injunctive relief does
not alter the preclusive effect of that litigation on the current
one in which plaintiffs are seeking damages. The issue to be
determined then, is whether or not both actions arise out of a
common series of transactions.

As of the time of the stipulation of dismissal in the prior
action, in fact several months prior to that date, every event
that makes up the facts of this case had already transpired. The

complaints in both actions are nearly identical and clearly deal with the same transactions. In sum, the transactions in question in both cases are the employment dispute between plaintiffs and Levenson regarding the renewal of Bouris' contract, the accessing and dissemination of the emails, the ensuing investigation into plaintiffs' relationship and the termination of Coughlin.

It is true that the termination of Bouris, as well as some other details in the current complaint, were not proffered in the prior action. These difference, however, do not defeat the School Committee's claim preclusion defense. As explained by the First Circuit in In re Sonus Networks, Inc, "The modern view, which prevails in Massachusetts, is that a party should be held to account not only for what he actually pleaded, but for what he could have pleaded in the earlier suit." In re Sonus Networks, Inc., 499 F.3d 47, 61 (1st Cir. 2007); see Gloucester 631 N.E.2d at 1024 ("claim preclusion bars not only relitigation of all matters decided in a prior proceeding but those that could have been litigated as well").

The last "transaction" of consequence, the termination of Bouris, occurred on September 5th, 2007; three months and six days before the voluntary stipulation of dismissal in the prior action.[11] Therefore, all events at issue transpired prior to the

---

[11] In addition to the prior action in the Middlesex Superior Court, plaintiffs, in the complaint, also include a reference to the arbitration order issued on October 27, 2009. (Docekt Entry

date of the final judgment.  Plaintiffs had the opportunity to raise those claims in their prior action either in the initial pleading or by amendment prior to the dismissal and apparently opted not to.  Those facts not raised in the prior action and asserted for the first time here arise out of the same nucleus of operative facts at bar in both cases.  Thus, this court finds a sufficient identity of claims for claim preclusion purposes.

### 3.  Valid Final Judgment

As a final matter, the voluntary stipulation of dismissal with prejudice, is, for purposes of claim preclusion, a valid final judgment on the merits precluding the parties thereto from relitigation.  Leung v. Lui, 2002 WL 362810, *2 (Mass.App.Ct. Mar. 07, 2002) ("This stipulation is sufficient to preclude the [plaintiff], and all in privity with [plaintiff], from maintaining an action that is 'derived from the same transaction or series of connected transactions'") (quoting TLT, 716 N.E.2d at 1051).  In the current case, however, only plaintiffs and the Arlington Public Schools (for these purposes the School Committee) were parties to the stipulation.  Not only are the unnamed defendants not signatories to the stipulation, but the

_____

# 1).  Asked to review the arbitrator's award the Middlesex Superior Court overruled the arbitrator's decision holding that the arbitrator exceeded the scope of his authority by focusing on a narrow question not properly before him.  (Docket Entry 31 Ex. 2).  The record fails to indicates that the arbitrator made the substantive conclusions suggested by plaintiffs.  (Docket Entry # 1).

stipulation itself expressly states that those defendants were never identified, noticed and never appeared in the action.

Therefore, there is a valid and final judgment as between plaintiffs and the School Committee, but it does not encompass the Doe defendants.  Thus, the current action is barred as between plaintiffs and the School Committee, pursuant to the doctrine of claim preclusion and it is therefore recommended that the School Committee's motion to dismiss be granted in its entirety.  Claim preclusion, however, fails as a defense with regard to the Doe defendants for want of a valid final judgment.  Thus, and for the reasons advanced supra, it is recommended that Levenson's motion to dismiss on claim preclusion grounds be denied regardless of whether or not he can claim to be one of the Doe defendants.

B.  Issue Preclusion (Collateral Estoppel)

Under the law of Massachusetts an issue, fully litigated and essential to the judgment, precludes the relitigation of that issue at a subsequent proceeding.  See Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987); see also Supeno v. Equity Office Property Management LLC., 874 N.E.2d 660, 662 (Mass.App.Ct. 2007); accord TLT, 716 N.E.2d at 1051 (reciting elements of issue preclusion defense).  Moreover, defensive issue preclusion may be asserted by individuals not party to the original proceeding, so long as the party against whom it is asserted was a party or privy to the

prior proceeding. <u>Supeno</u>, 874 N.E.2d at 663 ("nonparty may use collateral estoppel defensively against a party to the original action who had a full and fair opportunity to litigate the issues in question") (quoting <u>Martin</u>, 514 N.E.2d at 664).

Issue preclusion is not simply a tool to protect parties from the burden of unfair relitigation, but also a means to further the judiciary's interest in economy and to shield against judicial waste. <u>Banco Santander de P.R. v. Lopez-Stubbe</u>, 324 F.3d 12, 16 (1st Cir. 2003) ("'court on notice that it has previously decided an issue may dismiss the action sua sponte, consistent with the res judicata policy of avoiding judicial waste'"). In his answer Thielman raised the affirmative defense of collateral estoppel and while that defense was not adopted or independently raised as a defense in the pleadings or dispositive motions of the other defendants, this court has the discretion to address the issue sua sponte. <u>See</u> <u>Lewis v. N.H. Judicial Branch, et al.</u>, 2010 WL 432367, *3 (D.N.H. Feb. 03, 2010) (collecting cases).

In deciding a dispositive motion a court is "free to take judicial notice of certain facts that are of public record if they are provided to the court by the party seeking to have them considered." <u>Diceon Electronics, Inc. v. Calvary Partners, L.P.</u>, 772 F.Supp 859, 861 (D.Del. 1991). Courts have routinely regarded documents from prior state court cases as public

records.  <u>See</u> <u>Henson v. CSC Credit Servs.</u>, 29 F.3d 280, 284 (7th

Cir. 1994) (collecting cases).  The applicable documentation of

the prior state proceedings is properly attached to defendants'

motions (Docket Entry # 21, Ex. 1) and may be considered by this

court for purposes of resolving those motions.

Therefore, this court addresses the unarticulated issue

preclusion defense and takes notice of the prior action in the

Superior Court.  (Docket Entry # 21, Ex. 1).  That court

determined:  (1) plaintiffs had no privacy interest in the

accessing of the emails because they were sent/received on a

public network and because plaintiffs were informed through the

employment manual that such emails were considered public

records; and (2) any privacy interest plaintiffs had in the

sexual content of the emails was outweighed by the public's

interest in understanding the grounds for the termination of

plaintiffs as public employees.  Those issues were fully

litigated in the prior proceeding, and as such are precluded from

rehearing here.  Therefore, it is recommended that plaintiffs

claims be dismissed to the extent that they rest on a factual

determination inapposite to the decision in the prior action.

II.  <u>IIED</u>

A claim for IIED requires the plaintiff to establish:

"(1) that the actor intended to inflict emotional distress
or that he knew or should have known that emotional distress
was the likely result of the conduct; (2) that the conduct
was extreme and outrageous, was beyond all possible bounds

of decency, and was utterly intolerable in a civilized
community; (3) that the actions of the defendant were the
cause of the plaintiff's distress; and (4) that the
emotional distress sustained by the plaintiff was severe and
of a nature that no reasonable person could be expected to
endure."

Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (quoting

Agis v. Howard Johnson Company, 355 N.E.2d 315, 318-319 (Mass.

1976)).

By claiming IIED based on defendants' conduct as described

in the complaint, plaintiffs misperceive the restricted reach of

this tort under Massachusetts law.  See Chakrabarti v. Cohen, 31

F.3d 1, 6 (1st Cir. 1994) (recognizing that Massachusetts law

keeps a reasonably tight rein on the tort remedy for IIED).

"[E]xtreme and outrageous conduct" is behavior that is "so

outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."

Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 27 (1st

Cir. 1997); see e.g., Anderson v. Boston School Committee, 105

F.3d 762, 764-765 & 767 (1st Cir. 1997) (affirming directed

verdict on intentional infliction of emotional distress claim

concerning alleged harassment of teacher by principal).  While

they need not prove their case at this juncture, plaintiffs do

bear the burden of pleading facts that make their claim

plausible.  Ashcroft v. Iqbal, _ U.S. _ , 129 S.Ct. 1937, 1949

(2009). Plaintiffs fail to carry that threshold burden.

Recovery pursuant to an IIED claim requires proving more than "that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Doyle v. Hasbro, Inc., 103 F.3d at 195 (quoting Foley v. Polaroid, 508 N.E.2d 72, 82 (1987)). Plaintiffs fail to plead facts suggesting that Levenson's, Thielman's or Buck's conduct rises to such an exacting standard.

Additionally, the complaint merely recites the elements of the tort. Plaintiffs fail to plead facts evidencing that they suffered any emotional distress, let alone distress that is severe and unendurable to a reasonable person as is required to recover for IIED. Therefore, because the complaint fails to proffer outrageous conduct on the part of the defendants, and as neither plaintiff adequately pleads to having suffered the requisite emotional harm, it is recommended that plaintiffs' cause of action for IIED as against Levenson, Thielman and Buck be dismissed.

III. Section 1B Invasion of Privacy

Pursuant to section 1B, plaintiffs seek to recover against all of the individual defendants for having allegedly invaded

their privacy by accessing and disseminating the emails. In order to prevail, "a plaintiff must establish that the [invasion] was both unreasonable and either substantial or serious." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 682 (Mass. 2005). In order to be considered private, the information at issue must be of a "'highly personal or intimate nature'" and then only if there is "'no legitimate countervailing interest'" in disclosure. Id. at 682 (quoting Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 134 (Mass. 1984).

Plaintiffs are correct that the accessing and dissemination of private facts is indeed actionable under section 1B and that information regarding a sexual relationship could be of the type considered private. See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 (Mass. 1991). As discussed supra, however, it was already determined in the prior action that: (1) plaintiffs had no privacy interest in the accessing of the emails because they were sent/received on a public network and because plaintiffs were informed through the employment manual that such emails were considered public records; and (2) any privacy interest plaintiffs had in the sexual content of the emails was outweighed by the public's interest in understanding the grounds for the termination of plaintiffs as public employees. Upon that determination, plaintiffs do not have a cognizant privacy interest upon which

they may rely in asserting a claim pursuant to section 1B.[12]
Therefore, it is recommended that plaintiffs' claims for invasion
of privacy be dismissed.

IV.  Defamation

Under Massachusetts law, to prevail on a claim for
defamation the plaintiff must establish that:  "(1) the defendant
published an oral (slander) or written (libel) statement; (2) the
statement was about, and concerned, the plaintiff; (3) the
statement was defamatory; (4) the statement was false; and (5)
the plaintiff suffered economic loss, or the claim is actionable
without proof of economic loss."  Noonan v. Staples, Inc., 707
F.Supp.2d 85, 89 (D.Mass. 2010); accord Stanton v. Metro Corp.,
438 F.3d 119, 124 (1st Cir. 2006); and also Massachusetts Sch. Of
Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir.
2006).  A statement is "defamatory" if it "may reasonably be
[understood] as discrediting [the plaintiff] in the minds of any
considerable and respectable class of the community."  Disend v.
Meadowbrook Sch., 604 N.E.2d 54, 54 (Mass.App.Ct. 1992).

The tortuous conduct that may qualify as defamation has been
expanded by statute in Massachusetts to include the publication

_____

[12]  It should be noted that had this court not found the
issue precluded from relitigation, it would have independently
come to the same conclusions as the Middlesex Superior Court in
the prior action and for the same reasons regarding the public
nature of the emails and the extent of the plaintiffs' privacy
interest in them.

of statements that are truthful but otherwise defamatory.  <u>See</u>
Mass.Gen.L c. 231, § 92 (truth is defense to defamation unless
actual malice can be proven).  In the case of truthful
defamation, however, plaintiffs must additionally establish that
defendants acted with actual malice.  <u>Id.</u>  It is logical to infer
that the emails, having been written by plaintiffs themselves,
are truthful.  In any case, plaintiffs do not allege that the
emails were false and so fail to plead a claim of traditional
false defamation.  This court is left then to assume that the
allegation is that the emails, while true, were defamatory and
were published by defendants with actual malice.

Given then the posture of the defamation claim, it is
recommended that it be dismissed as brought against Buck.  While
there are sufficient factual allegations to make a claim of
truthful defamation as against Levenson plausible (i.e., there
are facts that make plausible the suggestion that Levenson
published the emails with actual malice) no such facts exist to
support the same allegation as against Buck.  Buck only accessed
and disseminated the emails at the behest of his boss, Levenson,
and there are no facts that suggest his motivation was anything
untoward.

Levenson allegedly engaged in multiple acts of publication
(for example, to Miller and the School Committee members as well
as the press) of the emails.  The complaint contains sufficient

facts regarding Levenson's conduct that make plausible the inference that he acted with actual malice with regard to the dissemination of the emails.  Therefore, to the extent plaintiffs defamation claims against Levenson are based on the publications of the emails, it is recommended that they survive.

Also as to Levenson, it is recommended that the defamation claim survive with regard to the allegations that he falsely and publically accused plaintiffs of forgery.  Plaintiffs, for present purposes, sufficiently plead that these allegations were false, were published, injured their reputations and caused them economic harm.  Therefore, it is recommended the defamation claims against Levenson regarding the allegation of forgery also survive.[13]

As for the claims against Thielman, he fails to respond to the defamation claims in his motion to dismiss and so it is

---

[13]  Both Levenson and Thielman raise the defense of conditional privilege.  "An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job."  McCone v. New England Telephone and Telegraph Company, 471 N.E.2d 47, 51 (Mass. 1984).  The privilege is lost, however, if the employer acts recklessly or maliciously.  Dragonas v. School Committee of Melrose, 833 N.E.2d 679, 688 (Mass.App.Ct. 2005) (conditional privilege lost if not made "chiefly for purposes of furthering the interest protected by the privilege" in the first place).  Therefore, because plaintiffs have sufficiently alleged actual malice with regard to Levenson and Thielman, See Fn. 14, even were the privilege generally applicable, it cannot shield either defendant for the purpose of deciding these dispositive motions.

recommended they survive these motions as unchallenged.[14]

## V.  Civil Rights

Pursuant to section 1983, plaintiffs bring claims against all defendants for violation of their civil rights.  The claim is brought against Levenson, Thielman and Buck in their individual capacity for directly engaging in conduct in violation of plaintiffs' civil and constitutional rights and against Levenson for failure to supervise Buck amounting to a deliberate indifference to plaintiffs' rights.

Further, Bouris asserts a claim against Levenson, and Coughlin against Thielman, for violation of their respective constitutional rights by threats or coercion pursuant to section

---

[14]  Even if that were not the case, however, the defamation claim against Thielman arising out of the publication of the emails would survive.  Thielman's only "publication" is the actual release of the emails to the press.  It appears from the record in the prior action that publication was pursuant to statute and was court ordered, and therefore could hardly be seen as being done with actual malice towards plaintiffs.  It is, however, alleged in the complaint that Thielman "surreptitiously" (Docket Entry # 1) released the emails on July 15, 2007, five months prior to the order denying plaintiffs' request for an injunction preventing their public release.

If this is true, that fact, combined with Thielman's statement to Couhglin that he would lose his job if he continued to speak out against Levenson, is sufficient at this stage to make plausible an inference that Thielman acted with actual malice.  Therefore, the defamation claim against Thielman survives to the extent that it is based on the dissemination of the emails to the press.  Additionally, for the same reasons as with Levenson, the defamation claim would survive with regard to the statement allegedly made by Thielman that plaintiffs forged documents.

11I.  Plaintiffs suggest that defendants violated their rights by:  (1)impermissibly accessing plaintiffs' emails in contravention of their privacy rights; (2) retaliating against plaintiffs for engaging in protected speech through the termination of their employment in violation of the First Amendment; and (3) by interfering with plaintiffs' right to their good reputation coincident to their termination.[15]

A.  <u>Section 1983 (individual capacity)</u>

1.  <u>Privacy</u>

As discussed supra, in the prior action the emails were determined to be public records and the privacy interest of plaintiffs in the content of the emails was held to be deminimis (i.e., any privacy plaintiffs may have had in the content was superceded by the public's interest in disclosure).  This court takes notice of that holding and finds the issue precluded from being relitigated here.  Thus, the emails are public records and in the context of these facts plaintiffs did not have an actionable privacy interest in them.  Lacking that prerequisite expectation of privacy, no constitutional violation is cognizant and to the extent that plaintiffs' civil rights claims rests on a violation of their right to privacy it is recommended they be

---

[15]  To the extent that the underlying constitutional injuries are identical for each statutory cause of action, this court addresses them in the section 1983 analysis but notes that the analysis is applicable to the other statutory provisions.

dismissed.

   2. Speech

Turning to the speech claim, a state entity may not deprive an employee of his employment interest in retaliation for statements protected by the First Amendment. Pickering v. Board of Education, 391 U.S. 563, 568 (1968) (finding teachers do not give up First Amendment rights they would otherwise enjoy as private citizens). Under First Circuit case law, a plaintiff asserting a claim of retaliatory termination must establish three elements:

> (1) that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern; (2) the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently; and (3) that there was a causal relationship between the protected expression and the retaliatory action.

Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004); accord Tripp v. Cole, 425 F.3d 5, 11 (1st Cir. 2005). If a plaintiff is successful in establishing these elements, the defendant may still avoid liability by establishing that the decision regarding plaintiff's employment would have been the same regardless of the plaintiff's protected speech. Mt. Healthy v. Doyle, 429 U.S. 274, 287 (1977). The defendant must make this showing by a preponderance of the evidence. Id.; see Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (reciting the standard under Mt. Healthy).

31

Plaintiffs' claims regarding speech fail on a number of grounds. As an initial matter, Bouris never proffers any facts in the complaint that suggest she engaged in any protected speech that could be inferred as the grounds for retaliation by defendants.[16] Lacking a showing of having engaged in protected conduct in the first place, Bouris fails to state a claim for recovery based on a violation of her civil right to engage in protected speech. Thus, it is recommended that Bouris' civil rights claims based on speech be dismissed.

Moreover, "it is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." Welch v. Ciampa, 542 F.3d 927, 936 (1st Cir. 2008). The allegation here is that plaintiffs' were retaliated against for having engaged in protected speech by the termination of their employment. (Docket

---

[16] The complaint alleges that, "Bouris and supporters of Bouris . . . brought certain information to the attention of the public and the School Committee." (Docket Entry # 1). Plaintiffs then go on to describe the speech engaged in by *Coughlin*. No further mention is made with regard to Bouris having engaged in any speech. Therefore, even if the quote above properly alleges that Bouris engaged in *some* speech, it fails to provide any factual allegations that she engaged in *protected speech*. As discussed in greater detail infra, when the party asserting the claim of retaliation is a public employee it is essential to plead that the speech related to a matter of public concern, and therefore is of a protected nature. Bouris fails to provide facts to that effect, or any facts with which this court could make a determination regarding the nature of her speech. Thus even to the extent some speech is plead, it is inadequate to survive these motions to dismiss.

Entry # 1).  Neither Buck nor Thielman had the authority to fire either plaintiff, and there are no allegations in the complaint that those defendants (Buck and Thielman) were somehow involved in plaintiffs' termination.  Therefore, neither Buck nor Thielman could have retaliated against plaintiffs by terminating their employment and it is recommended that the civil rights claims against Buck and Thielman couched in terms of retaliation be dismissed.  See Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (the "plaintiff must point to some evidence of retaliation by a pertinent decision maker"); accord Bibiloni Del Valle v. Puerto Rico, 661 F.Supp.2d 155, 181 (D.P.R. 2009).

In terms of retaliation claims, only Coughlin's claim against Levenson remains to be addressed.  Coughlin asserts the single act of speech in which he revealed that Levenson had not been the Assistant Superintendent of Harvard Public Schools.[17]

In order to rise to the level of protected speech, however, a statement must be made "by the teacher in his role as a citizen and not in his role as an employee of the school district."  Kirkland v. Northside Independent School District, 890 F.2d 794,

_____

[17]  Plaintiffs in their reply brief suggest that it can be inferred that Coughlin engaged in various instances of speech over the course of several months.  Even if those inference could be reasonably made, plaintiffs fail to adequately plead that those additional instances of speech related to a matter of public concern and therefore were protected.  Absent a more specific factual pleading, Coughlin fails to carry his burden of pleading facts that these other instances of speech were protected.

798-799 (5th Cir. 1989) (finding teacher's supplemental reading list not a matter of public concern and therefore not protected speech). The determination of whether the speech at issue is constitutionally protected is for the court's resolution. Connick v. Myers, 461 U.S. 138, 148 n.7 (1983) (holding employee's First Amendment rights were not violated when fired for distribution of non-protected material).

In answering this threshold question, the court must determine whether the plaintiff spoke "as a citizen" and whether the speech addresses "any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. "This is a case-specific, fact-dependent inquiry" that requires the court to examine the "'content, form and context of a given statement as revealed by the whole record.'" Davignon v. Hodgson, 524 F.3d 91, 101 (1st Cir. 2008) (quoting Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)). While the content of the speech is of preeminent concern, the First Circuit has "repeatedly cautioned against allowing the inherent public concern category to draw too many types of cases within its gravitational pull." Id. at 101.

In the current case, Coughlin's statement that Levenson engaged in misconduct by misrepresenting his qualifications during the hiring process does not qualify as speech touching public concern. See Storlazzi v. Bakey, 894 F.Supp 494, 502 (D.Mass. 1995) (finding that while criticism of administrators

and their policy is of public concern, statement that "certain administrator had lied at a school committee hearing" is not and thus not grounds for a retaliation claim). It is true that reporting official misconduct by a public official committed within the auspices of her position could fall within the gamut of protected speech. See Connick, 461 U.S. at 148 (noting speech is of public concern when it reveals "actual or potential wrongdoing or breach of public trust on the part of the [government official]"); see also Baron v. Suffolk County Sheriffs Dept., 402 F.3d 447, 235 (1st Cir. 2003) (report of official misconduct by government official *within* public office is of public concern).

Here however, the statement by Coughlin was not that Levenson engaged in some official misconduct, that is *within* his public office, but rather that he misrepresented himself in the hiring process. Said another way, to the extent that Coughlin was revealing misconduct on the part of Levenson, the misconduct occurred prior to Levenson becoming a public official and was not committed in his official capacity. Therefore, the content of the speech, standing alone, does not warrant a finding that it related to a matter of public concern. Nor, however, does it warrant a finding that the speech was inherently private, only that an examination of the context and form of the speech is required to decide the issue.

Turning then to the context and form of the statement, it is clear from the record that it was made in the course of an employment dispute and therefore is correctly categorized as unprotected private speech. Tripp, 425 F.3d at 11 (holding speech unprotected when "[plaintiff] was speaking primarily as an employee concerned about . . . his personal working relationships, not as a concerned citizen on matters predominantly of public concern"). Plaintiffs describe Coughlin's statement, and statements by other teachers and staff, as a "backlash" that "forced Levenson to change his decision and to renew Bouris's [sic] contract." (Docket Entry # 1).

Thus, Coughlin's statement was made in the context of an employment dispute and was designed, not to inform the public of Levenson's misrepresentation, but to put pressure on Levenson to rehire Coughlin's colleague Bouris. See O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993) (in context and form the plaintiff's "expression [does not] suggest a subjective intent to contribute to any public discourse"); see also Linhart v. Glatfelter, 771 F.2d 1004, 1010, (7th Cir. 1985) (to determining if speech is protected "requires us to look at the *point* of the speech") (emphasis in original).

Viewed from a different angle, Coughlin was not speaking as a *citizen* when he made the statement, but rather as an *employee*. Even if the content of the speech could be characterized as

relating to a public concern in a different context, because here the statement was made by Coughlin in his role as an employee and not a civic minded citizen, it is not protected. See <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 416-417 (2006) (recognizing that the inquiry as to the public/private nature of the speech requires a two part determination (1) that the employee spoke as a citizen and (2) that the speech was a matter of public concern).

In sum, Coughlin was a public employee and thus had restricted speech rights when speaking in that capacity. Given the context and form of the speech it is clear the statement related to a private employment dispute and was made in Coughlin's capacity as employee and not citizen. "To be sure it is not difficult to conceive of slightly different speech under slightly different circumstances that could legitimately be described as primarily of public concern." <u>Tripp</u>, 425 F.3d at 11. Here, however, Coughlin's speech activity as alleged in the complaint does not warrant First Amendment protection and cannot be the grounds for a retaliation claim pursuant to section 1983.

### 3. <u>Reputation</u>

In order to claim a violation of constitutional rights by means of an injury to reputation, in addition to the defamation it must be shown that the plaintiffs suffered some injurious and tangible alteration of status. <u>Hawkins v. Rhode Island Lottery Com'n</u>, 238 F.3d 112, 115 (1st Cir. 2001). While termination is a

sufficient "change in status," the termination and injury to reputation must occur coincident to one another in order for there to be a constitutional violation.  As described by the First Circuit in <u>Hawkins</u>:

> Appellant argues that defamation by the defendants, together with his termination, constituted the 'stigma plus' injury that is necessary to establish a claim for deprivation of liberty in violation of the Due Process Clause of the Fourteenth Amendment.  The district court rejected this claim on the ground that the defamation and the termination were not coincident; *some of the defendants lacked authority to terminate appellant while others, so far as the record showed, uttered no defamatory statements.* The court relied on case law, from the United States Supreme Court and this court, holding that "the defamation had to occur in the course of the termination of employment[.]"

<u>Hawkins</u>, 238 F.3d at 115 (affirming district court ruling) (internal citations omitted) (emphasis added).

Here, as in <u>Hawkins</u>, two of the defendants, Buck and Thielman, lacked the authority to fire plaintiffs.  As such, even if both of those defendants had engaged in defamatory conduct, neither was responsible for plaintiffs' alteration in employment status, and thus neither can be said to have injured plaintiffs' reputations in violation of their civil rights.

With regard to Levenson and plaintiffs' allegations that he unconstitutionally injured their reputations, it is recommended that the claim survive these motions.  Levenson's defamatory publication of the emails was sufficiently coincident to the change in status for the claim against him to survive.  <u>Cf.</u> <u>Hawkins</u> at 115 (the plaintiff failed to allege requisite "stigma

plus injury" where director of the Rhode Island Lottery Commission removed by Lottery Commission following defamatory statements by governor, where governor neither spoke for Commission nor controlled its actions, statements and director's removal not sufficiently linked).

B.  <u>Section 1983 (supervisory capacity)</u>

Levenson cannot be held liable for a failure to supervise Buck because all of the underlying claims of unconstitutional conduct asserted against Buck have been dismissed.  It is obvious that a supervisor cannot be held liable for the misconduct of a subordinate if that subordinate has in fact not engaged in any misconduct.  Thus, it is recommended the claims asserting supervisory liability against Levenson be dismissed.

C.  <u>Section 11I</u>

As a final matter, it is recommended that the section 11I claims be dismissed as against Thielman but survive as against Levenson.  To establish a claim under section 11I, plaintiffs must prove:  (1) the exercise or enjoyment of their constitutional or civil rights; (2) has been interfered with, or attempted to be interfered with; and (3) that the interference or attempted interference was by "threats, intimidation or coercion."  Mass. Gen.L. c. 12, § 11H.

"[T]he insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to

limit liability under the act." Freeman v. Planning Bd. of W. Boylston, 646 N.E.2d 139, 149 (Mass. 1995). Conduct constitutes a threat, intimidation, or coercion if a reasonable person would feel threatened, intimidated or coerced into acting or not acting in contravention of his or her civil liberties. See Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). As described by the court in Ayasli:

> A threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." And coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Ayasli v. Armstrong, 780 N.E.2d 926, 935 (Mass.App.Ct. 2002) (internal citations omitted).

In the case of Coughlin's claim against Thielman, had Coughlin's speech been protected speech, then Thielman's conduct in threatening Coughlin with the loss of his job would likely have been actionable pursuant to section 11I. As explained supra, however, the speech that Coughlin engaged in was not protected speech and so Thielman's alleged attempt to stifle it does not rise to the level of harm required by section 11I.

In the case of Bouris' claim against Levenson, however, a claim pursuant to section 11I is sufficiently plead to survive dismissal. Allegedly, Levenson attempted to coerce Bouris to resign, thereby attempting to deprive her of her property rights,

by implying he would start a rumor that she sexually abused a student. (Docket Entry # 1). As noted previously, in determining whether a defendant's conduct constitutes a threat or coercion, the court applies an objective reasonable person test.[18] Kennie v. Natural Resource Dept. of Dennis, 866 N.E.2d 983, 987 (Mass.App.Ct. 2007). Therefore, the inquiry is whether a reasonable person would have been threatened, intimidated or coerced by Levenson's comment into acting or not acting in contravention of the person's civil rights.

The threat to start a rumor that Bouris engaged in such abhorrent behavior, and the potential consequences for Bouris had the rumor actually been started, amounts to the conduct prohibited by section 11I. The fact that the intended constitutional harm was not actually realized by means of this threat (i.e., Bouris did not resign) is immaterial, only the attempt to violate is required for a section 11I claim. Therefore, it is recommended that the section 11I claim against Thielman be dismissed, but the claim against Levenson survive.

VI. IABR

The plaintiffs must show, to establish IABR, that: "'(1) a business relationship or contemplated contract of economic

_____

[18] It should be noted that defendant's conduct need not involve physical force in order to amount to an actionable threat, intimidation or coercion. Kennie, 866 N.E.2d at 987 n. 10 ("threatened harm need not be physical").

benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and [improper] interference with it; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.'" Welch v. Ciampa, 542 F.3d at 943 (quoting Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982)). "It is true that, in general, a plaintiff cannot bring a suit for tortuous interference against a party to the underlying contract." Id. at 944. "In the employment context, this usually means that 'an employee may not sue her employer for interfering with its own contract.'" Id. (quoting Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 76 (1ˢᵗ Cir. 2001)).

Levenson suggests that he cannot be liable for IABR because as the Superintendent he was party to the employment contract. Even if that were true, when the claim is brought against a supervisor or other party to a contract, the supervisor can be held liable if, beyond mere impropriety, "'actual malice' . . . was the 'controlling factor' in the [supervisor's] interference." Id. ("district court erred in concluding that Welch could not maintain an action for [IABR] against Ciampa because Ciampa, representing the Town, was representing the employer, a party to the employment relationship") (quoting Sklar v. Beth Israel Deaconess Med. Ctr., 797 N.E.2d 381, 385 (Mass.App.Ct. 2003)).

As discussed supra, sufficient facts have been plead to substantiate a plausible claim that Levenson acted with malice.

Since plaintiffs have sufficiently plead facts alleging actual malice and the other elements are clearly satisfied, it is recommended the claim of an IABR as brought against Levenson survives.

The same cannot be said, however, with regard to the claim against Buck. While plaintiffs need only plead facts that demonstrate that Buck intentionally acted with improper motive or by improper means, <u>American Private Line Services, Inc. v. Eastern Microwave, Inc.</u>, 980 F.2d 33, 36 (1st Cir. 1992) (reciting elements of IABR claim), in light of the determinations made in the prior action, plaintiffs cannot meet this burden. As discussed supra, there are no facts in the record that suggest Buck acted with an improper motive. Therefore, as a threshold matter, plaintiffs' claims can only survive if Buck acted by improper means when she accessed and gave the emails to Levenson.

In light of the preclusive determination in the prior litigation that plaintiffs had no privacy interest in the emails and because Buck was carrying out her function as network administrator, no plausible inference can be made that Buck acted by improper means when accessing the emails or turning them over to her boss. Moreover, even if the accessing of the emails was improper, there is nothing in the pleadings that would suggest it was Buck's *intention* to interfere with either of the plaintiffs' employment status.

43

It is plaintiffs' burden to plead facts making plausible the suggestion that Buck intended to interfere with plaintiffs' employment status, as well as provide factual support for the allegation that Buck acted either with an improper purpose or by improper means toward the accomplishment of that intended goal. As plaintiffs fail to provide facts supporting these essential elements of the claim it is recommended their claims against Buck for IABR be dismissed.

As for the IABR claims against Thielman, plaintiffs fail to sufficiently allege that their "loss of advantage" was the direct result of that defendant's conduct.  See Ciampa, 542 F.3d at 943 (discussing causation element).  Even if the disclosure of the emails was improper and it was Thielman's intent to interfere with plaintiffs' employment status, the specific disclosure by Thielman to the press cannot be said to have directly caused plaintiffs' termination.

At the time of Thielman's alleged release of the emails to the press on July 15, 2007, the emails had already been independently accessed by Levenson and Buck, had been provided to Levenson by an anonymous tipster and had been reduced to official reports by Miller in the course of his investigation.  Levenson initiated the investigation into plaintiffs' relationship months prior to Thielman's disclosure of the emails.  It was Levenson that made and effectuated the final decision to terminate

44

plaintiffs' employment.  At the time he made that decision, Levenson had the emails available to him, independent of Thielman's disclosure, from a variety of sources and had them available to him for some time.  Thus, plaintiffs fail to allege any facts that would suggest that Thielman's disclosure directly caused or even contributed to the eventual termination of plaintiffs.  Therefore, it is recommended that the IABR claim be dismissed with regard to Thielman.

CONCLUSION

For the foregoing reasons, this court **RECOMMENDS**[19] that the School Committee's motion to dismiss, (Docket Entry # 20), counts V and VI be **ALLOWED.**

Additionally, this court **RECOMMENDS** that Levenson's motion to dismiss (Docket Entry # 22) counts VII, VIII, XVII, XVIII, XXXV and XXXVI be **ALLOWED, RECOMMENDS** that counts XV, XXIII, XXIV, XXIX and XXX be **DENIED** and **RECOMMENDS** that counts IX and X be **ALLOWED** in part and **DENIED** in part.

Additionally, this court **RECOMMENDS** that Buck's motion to

---

[19] Any objection to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of the Report and Recommendation to which objection is made and accompanied by the basis for such objection.  Any party may respond to another party's objection within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  See Rule 72, Fed. R. Civ. P..

dismiss (Docket Entry # 30) counts XIII, XIV, XXI, XXII, XXVII, XXVIII, XXXIII, XXXIV, XXXIX and XL be **ALLOWED**.

Additionally, this court **RECOMMENDS** that Thielman's motion to dismiss (Docket Entry # 38) counts XI, XII, XVI, XIX, XX, XXXI, XXXII, XXXVII and XXXVIII be **ALLOWED**.  Thielman did not address Counts XXV and XXVI in his dispositive motion and so this court **RECOMMENDS** those counts survive as unchallenged.


        /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge